I fumbled the ball on more than a couple of occasions with respect to the different parties. Good morning. Just to be clear, John Demers for Boston Scientific. May it please the court, this case has been here a few times. The last appeal, the court changed the claim construction for the claim term smooth surface. The court broadened the construction. Because the construction was broadened, there was no issue with infringement. But the case was sent back to the district court to consider validity in light of the broadened construction. Under this court's well-established law, the district court was supposed to test whether the change in construction could not have changed the result. In other words, it was incumbent upon the district court to examine, and this is from the Echolab case, to examine whether there was sufficient evidence at trial to support a finding of invalidity. That was what the test was supposed to be. Is another fair way of saying it, whether or not the change in the claim construction error was harmless? That's another way to say it, but the court here has articulated what they mean by that. This is a pretty important point at which there is really a fork in the road between the parties. You are saying all that you have to show, if I understand your argument, is that there was enough evidence on your side to make a submissible case. Well, that's what this court said in Echolab. This is a quote from the case that said the district court had to examine whether there was sufficient evidence at trial to support a finding of invalidity. That's right from Echolab. The general rule on harmless error, of course, is much more forgiving. The Kadiakos principle, which is along the lines, if I remember the general thrust of it, is that the court has to be confident that it's not likely that the change in whatever the error was would have produced a different verdict. That's a very much more forgiving standard, right? Yeah, I think there's a good reason for the dichotomy. I think when you're talking about regular trial practice outside the area of claim construction, you're talking about a whole body of jury instructions and small errors that may occur throughout the jury instructions, and the district court sitting at that trial being able to assess the fulsome nature of what happened at the trial and judging did these small errors in the jury instructions have some sort of error that is harmless. And the judge has a good basis to decide that based on the full record and the kinds of errors that occur regularly in jury instructions. But in the claim construction context, it's very different, because when you change what the words in the claim mean and send it back to the district court and say, does this broader construction change validity, you're asking the district court to do a summary judgment analysis, to look at the new claim term, a new scope of the claim, and assess validity or invalidity. That's a summary judgment question. And if you look at the words this court used in ECLAB, it's exactly what you articulated. You said, examine whether there was sufficient evidence at trial to support finding of validity. So this court has told the district courts, for this limited area of claim construction, when we send it back to check for harmless error, harmless error in that context means, essentially do a balance like you would do in a summary judgment context. And that's the only fair thing to do. Think about what's happened in this case. We're here, and make no mistake, this is one of the largest patent infringement verdicts in history. Polaroid credit was 908. This is over $700 million. And we, as I stand here today, have never had a jury trial on validity on the kind of construction that this court ordered. That's not fair. We should have a fair chance to test the validity of this patent before we pay the second-highest verdict ever in the history of patents. The district, I mean, when this court sent it back, it said, you know, the judge is going to look at whether or not there's a factual issue. And the judge here says there's no credible evidence that, and you pronounce it IRSEC, or? You can either say IRSEC. Disclosed a graph that was smooth enough to deliver intramurally. Where was the evidence? You went right to where I was going next. So there's two things. We don't need to resolve the issue of the legal test in this case because that quote that you just read is what I was going to say. The district court violated either test because the test is supposed to be objective. What happened? Could it have changed the result? What she said was there is no credible evidence in the record to support BSC's contention.  She essentially discounted BSC's evidence. We have more than ample evidence. We have Dr. Lowe testified that IRSEC was intraluminally deliverable from the point of view of a person of ordinary skill in the art. Dr. Lowe did. Dr. Lowe then made IRSEC and tested it on pigs and actually intraluminally inserted it to the coronary arteries of a pig and testified about that during the trial. And BSC brought Dr. Schneider, who also said IRSEC was intraluminally deliverable. He explained what IRSEC actually discloses and how it would work. So what happened at the trial? Did we have Dr. Lowe testify that it was intraluminally deliverable, which is the new construction? We had Dr. Schneider testify about it. And we had tests on experiments done with IRSEC that actually showed it was intraluminally deliverable. So just going back to tie this then to what you were arguing about at the outset, which is the standard. So your view is she should have assessed this as one would assess assembly judgment. Yes. When you see those two experts with their testimony plus the experiments they described, you cannot say that this error was harmless because a district court assessing that can't conclude that a jury couldn't come out for us. In other words, if the jury believed Lowe and believed Schneider and believed the test, we would have an invalid package here. But is that test, though, designed to prevent the harmless error review under ECHOLAB, or is it really a Third Circuit review that we have to look at for harmless error and discretionary within the district court's provisions? In other words, is the issue of review, the standard review for us under Federal Circuit law is defined by ECHOLAB, or is it under Third Circuit law? I believe in the traditional context of harmless error and mistakes of law that happen at a trial, when the judge says a harmless error, that would be a Third Circuit review by you, and you'd have to apply Third Circuit law. And that would be an abuse of discretion. And that would be an abuse of discretion. I think in this particular case, because the alleged legal error relates to claim construction, where the court here has changed the construction, that's an area that's unique to patent law, and the test that you lay down in ECHOLAB should be the test. And the review, and the standard of review we apply? And the standard review there would be similar to standard judgment, which would be de novo. So you would test whether the trial court properly weighed the evidence and concluded that the result couldn't have been different, or in the words of ECHOLAB, that there wasn't sufficient evidence to sustain validity if the jury believed our evidence, and then you review it de novo. But either way, this is the point I was making, you don't need to decide that in this case, because either way, what the judge did here was go in and weigh the credibility of the evidence, and she decided which to believe and which not to believe, and she didn't do the test as laid down either in the Third Circuit or in this court, because she decided to discard Boston Scientific's evidence. If the jury believed, under the broader construction, that Dr. Lowe and Dr. Snyder were telling the truth, and they liked their testimony and they believed in the test, then this ERSEC is interluminary deliverable, fits within the construction. Make no mistake here, this claim was fully rejected in the patent office over ERSEC. Everything was rejected. The patentee then added smooth surface to the claim. That's the only thing that got it allowed. This was the key claim term about validity of this patent. That's what got the patent to issue. And the court has defended this case by saying ERSEC has bumps and projections, and therefore is not a smooth surface, and that's what they argued at the trial level. You've taken those limitations out of the claim. We should have a fair chance to defend. And it's not just ERSEC. This also applies to the Palmaz Abstract Prior Art. There are two pieces of Prior Art, and the district court actually said with respect to the Palmaz Abstract that this court's new construction was broadened out the claim, now captures the Palmaz Abstract, but then she said for other limitation reasons about the expandability, that one wouldn't have changed either. But again, to rule that way, she had to discount the testimony of Dr. Snyder. What about commercial success? I mean, the other side falls back ultimately on the fact that the commercial success factor did not change. The commercial success factors don't change. And to what extent does that affect our analysis? Well, if the patent is invalid, if the art reads on the claim, or the claim reads on the art, the commercial success is not relevant. So I think it doesn't matter. But the commercial success, if you want to address that point, is all about how the method is used to treat these patients. That has nothing to do with Claim 23. Claim 23 is just the apparatus. So I think, you know, in any event, I think we've addressed that. I think we'll probably end up expanding your time in the event of it, because there are three issues here. Let me, at the risk of covering already plowed ground, go back to this test, because it's important what test we apply, obviously, to this. Let me see if I understand exactly what your submission is as to what we should do in looking at the trial judge's determination. And let me give you a hypothetical, so we'll take it out of the context of this case. Suppose you have a jury instruction. The judge says, this is a question the jury can go either way on, and here's my instruction. And it goes to the jury with that instruction. Verdict for the plaintiff. Now, on appeal, the court says, well, you know, the instruction wasn't quite right. It was very slightly too favorable to the defense. Now, whether the appellate court decides, or whether the appellate court sends it back to the district court to decide, is it your submission that as long as the question, as long as the issue of viability would still appropriately go to the jury under the amended claim construction, there has to be a new trial? Or is it the case that the court of appeals or the district court could say, there is so little difference between these two constructions that there's no reasonable likelihood that the jury that decided the first case would have come out differently if they had had that instruction? Which is it? Because I think you're arguing the first. I'm not sure I understand your hypothetical exactly. Maybe if I try to articulate it, you can redirect me. In this particular case, a good example is case smooth service. You broaden that. Obviously broadening it has no effect on infringement. We don't have to retry infringement. But on validity, you broaden it, so now we have to say, did that broadening affect an issue that was at the trial? And that's the point that I was making. The question is, what do we mean when we say that? That's a critical issue. Let me finish to flesh it out, and then you can redirect me. So smooth service, as previously defined, said if it has bumps or it's rough or what have you. That was tried. So in other words, Cordes' defense to why ERSIC didn't invalidate, they actually said it, and I can show you this. They said ERSIC has bumps and ridges. So we tried the issue directly on that claim term, and that claim term was the only thing that got that claim allowed because the claim stood rejected. Smooth service was added to get over ERSIC, and the court determined it was bumps and ridges. And then Cordes tried to the jury, ERSIC has bumps and ridges. So when this court then broadens out that key term that was the thrust of the trial to say no, just intraluminal delivery, bumps and ridges no longer matter, and now it becomes, well, was there proof in the record that could have satisfied that broadened? Now you're right at the point at which I think you're about to answer my question. If the changed construction didn't change the thrust of what was tried, so for instance, if you change a construction but it still required bumps and ridges or what have you, and that issue was, you know, fulsomely developed at the trial, the district court in that scenario would have a different analysis than what happens here, which is bumps and ridges no longer matter. Now the construction is intraluminal delivery, which is much broader. The district court herself admitted it sweeps in products that were previously disqualified. All right, but I think you were edging up on saying, and I don't want to put words in your mouth, but this again is important at least to me. Yeah, of course. It's important to all of us. Well, maybe I'm running down a false trail here, but it seemed to me you were about to say, maybe you weren't, that what is important is for the district court to consider whether or not the result in the trial that was held would have been different. Yes. All right. Yes. And so she would have had to conclude that this jury, this verdict would have been changed in all likelihood if that construction had been presented to this jury. Right? Yeah. That's what I don't understand. The change in the construction could not have changed the result, is the way it's articulated in ECHOLab. Well, so you're saying there's a difference between her establishing that it would have versus it could have? I mean, is that what you're saying? No, no, I'm not sure. No, no, but what I'm saying, let's take an easy example, and maybe this gets it here. If she changed another one of the limitations that was not the thrust of the jury trial, then it's easy to say, no, the result would not have changed if we changed element one, because that wasn't what the trial was about. Unless, of course, you're changing it in a way that rules out infringement of validity. But what was changed here was the key limitation, and it was changed in a way that changed the defense. Having bumps and ridges in the definition of smooth, and having the parties try whether IHRSA had bumps and ridges, and IHRSA, in fact, has bumps and ridges, and that's what the jury concluded, and that's why the patent claim was not invalid. To take bumps and ridges out and say, as long as it can be intraluminally delivered, that satisfies the claim. Even with the bumps and ridges? Well, that's what this court did. This court said, as long as it can have bumps and ridges, as long as it can be delivered intraluminally, it meets the claim. But if she decided that even with that change, the jury would have come out with the same result, is that wrong on her part to conclude that? Is that a standard of our review that we have to look at, not from the position of an abuse of discretion on her part in determining Arnold's error, but a change in the result of the jury determination, which would be a summary judgment review, as you're pointing out, under ECOLA. Yes, it's wrong because in this case, what happened here is there was proof in the record by Dr. Lowe and Dr. Snyder and their experiments that ERSEC could be, and in fact was, intraluminally delivered and deliverable. If that evidence wasn't in the trial record, if we didn't put in evidence of that, and you change the construction to be, then she could look at that and say, well, you know, there was no proof in the record that Boston Scientific could rely on that would support. That ERSEC was deliverable intraluminally without modification? I thought you said there was evidence that ERSEC could be delivered intraluminally. Yes, along with Dr. Snyder's testifier system. But wasn't that with modification? In other words, basically you crimped down the sharp edges, right? But ERSEC tells you, in the ERSEC reference itself, it says you can cuff and smooth the edges. It says it right on the reference. So they followed the teaching of the reference, made a sample, and then delivered it. I found the word cuffing to be unclear. Is there any indication as to what that means? I mean, I know what it means on pants. Does it mean the same thing for stents? Well, the experts testified as to what it meant to them. Which was? Similar to what it means in pants. So you just roll the edges. And grind smooth them out. Right. So there are two other issues that I feel... Well, I think we really could find it useful to carry on. Yes. Thank you. So let's discuss the stipulation a bit. Yes, that's exactly what I was going to say. You're heading that way? Fine. The very next point I was going to make. At the 2000 damages trial, the district court was going to instruct... The trials were staged. The Medtronic trial first, and then the Boston Scientific trial. So we came second after Medtronic had lost. The district court was going to instruct the jury that the Medtronic stents were just found to infringe by a prior jury. That was hugely inflammatory to Boston Scientific prior to the trial that we were going to try the same patent on. So we were put in a box, or Boston Scientific was put in a box. I wasn't there. And they were asked to either let that be told to the jury or stipulate that you weren't going to argue that they were not infringing substitutes. And so being put in that box, they said, okay, for the purposes of this trial, we'll agree that they're not infringing substitutes and won't even go there. And we put in also the Medtronic S-series stents. Then what happened? We go to verdicts. And after the verdict in the J-MAL process, the district court reverses or J-MALs the Medtronic verdict, concluding now that these were in fact non-infringing substitutes. So she examines the record, and she orders a new damages trial for Boston Scientific, because we tried a case assuming that they were infringing when they were not infringing. And she found, and there's an express finding in the record, and this is one of the things that's troubling. The district court at the time writes, the court finds that Boston Scientific did not unconditionally stipulate that the ABE stents infringed the claims. I mean, the problem I'm having, you're walking us through the steps, and I think we're all familiar with the facts, and I appreciate that. I'm having trouble. I mean, it's sort of like when a mother does a good thing to her kids and then they use it against her for the next 25 years. I mean, it seems to me perfectly reasonable that in that context, it was really a legal question. I mean, it had to do with the outcome of litigation, and it was a legal question. They were going to put it in because the jury had raised this, well, now the jury. It seems to me it was perfectly reasonable for her to do what she did in that context. But it still seems to me that it's a different context. When you were trying to take the license was in effect at the time this litigation was going on in 2000, right? I mean, there was a license out there between the other parties. Yes. And presumably Boston Scientific knew about that. Yes. If there's a license that arguably covers the products, you were free to decide whether or not you would try to use that as evidence that there were non-infringing products out there. For whatever reason, and we can't second guess it now or whatever, you decided not to do that. Why then simply because subsequently the arbitrator found this, and I don't know why you didn't put it in, would a party be able to then go back and say they knew these damages? One, it seems to me that's more of a factual inquiry than the pure legal question that she was dealing with in terms of the first issue with regard to the stipulation on the jury. No, no. I'm glad you crystallized it for me so I know exactly where to go, which is this. If you look at the trial transcript from the first trial when we were put with the choice of stipulate that these are non-infringing substances, these mental health stents, or we're going to instruct the jury about the prior jury finding, we were forced at that point to include the S-series stents because the judge said, and this is in the transcript in the appendix, the judge said if you're not going to agree to the S-series as well, even though the S-series wasn't in the trial, we were debating whether we were going to make this license issue, if you don't agree to the S-series as non-infringing as well, we're going to tell the jury about the prior jury verdict because Cordes wanted to argue that the jury found these stents infringing and the S-series looks just like them. Yeah, but that's kind of my point, that you made a strategic determination at the time that it was worth more for you to not let the jury verdict in than it was to include the evidence with respect to the license. I can't deny that. So why, six years later, an arbitrator happens to go that way. I mean, if the jury verdict had come out the other way and the arbitrator had ruled the other way, I mean, you certainly wouldn't be here agreeing with the other side. They ought to let the arbitrator's decision in. It seems to me the two issues are kind of divorced. You made a strategic decision and you now need to live with that. No? No, because we were forced into a strategic decision based on the judge's going to tell our jury about a prior jury verdict and that was a stipulation we made at the time specifically for the purposes of that trial. And the judge found, after that, that that was not an unconditional stipulation and we should have gone back to retry when she gave Jay Malson. Well, not unconditional to the extent that when the jury's verdict was then flipped, you could get out of it. So saying it was not unconditional could be read broadly, as I think you would like to read it, but it could also be read narrowly in terms of what she thought the parameters of your getting out of that agreement were. But the exact same logic, if we were able to retry damages because they were not infringing Medtronic stents, what difference does it make if they were not infringing because of the jury trial or not infringing because of an arbitrator's award? It's exactly the same issue. The issue is simply this. This is the second largest patent verdict in history and we all know, everybody in this room knows, it's wrong. They got $700 million because they proved to a jury they were not infringing substitutes and that's wrong. That's not true. Yeah, but unfortunately in our business, as you know, sometimes you're forced into that. I mean, every case where there's a waiver and we find there's a waiver, it could very well be that if there were no waiver, the result would be astronomically different. But I'm not sure why that compels us. Because the district court told us there wasn't a waiver. She has a written decision where she writes, she finds, based on the circumstances, Boston Scientific had only stipulated that for that trial. But she seems to have changed her mind. Yeah, for that reason alone, that can abuse a district court. No, no, no. A judge reversing 180 degrees with no explanation? In the later order, there's no explanation as to the reversal of the position. There's no explanation. Suppose she said, I think I got it wrong the first time. You would be prejudiced by your alliance. There was a rational explanation for a position why an earlier finding was incorrect. She made a finding in that earlier opinion. I understand. But it's not unusual for judges to change their mind. I'm pretty guilty of that. In order to be bold in general. Let me ask you this. Oh, go ahead. There's a second reason why this damages award should be sent back to be retried, which is the point we made about in March of this year, this court has affirmed the infringement of the 021 patent. The two products that court has had at the trial that they claim lost profits on were the BX Velocity and the Cypher. Those products infringe Boston Scientific's 021 patent. It's been affirmed by this court. You can't get lost profits for products you shouldn't have been selling in the first place. There's a breach in the causation there. This $700 million verdict should be sent back to properly assess the market. And the market is, court has said only products that they claim lost profits on infringe Boston Scientific's patent. And two, Medtronic had two series of non-infringing sentences. There's no way this verdict should be at $700 million. I'm still back at the stipulation stage. Now, I presume that you would agree that the Third Circuit law would apply to this? Yeah, I do. You do. No objection to that. No objection to that, no. How would you measure the action that was taken by the district court judge when she had no explanation for reversal under the Third Circuit law? That's an abuse of discretion. An abuse of discretion. Yeah, and I think that we cited a case in our brief that says a change in position without explanation is an abuse of discretion. That's the Wall case? Wall or Wings. Wall or Door versus Shooter? Yes. And in that particular case, there were three instances which provided for the possibility of error on the part of the lower court. And one of them is specifically related to the mistake of Wall. Would you say that the stipulation that was submitted at the jury, there is a not that's missing there on the stipulation. But if it's properly included, would that be a mistake of Wall or a mistake of fact at that point? I think that the issue that we're grappling with is a mistake of fact because the district court found in the first instance that Boston Scientific had not unconditionally stipulated, and now she has changed that and found that we did. Well, I don't know what she found because she didn't explain it, but I'm assuming she found that we did unconditionally stipulate, and so she's changed her factual finding without explanation. So that would be sufficient to establish an abuse of discretion on her part at that point in time. I believe so, yes, under the Third Circuit standard, especially since there's no explanation for it. If nothing else, we should go back and get a proper explanation and litigate the issue because what happened here, McNamara said, we were proceeding under the assumption we were going to trial. She had ordered a new damages trial. She had withdrawn the stipulation. My client had retained us to try the case. And then out of the blue, we get an order saying no new trial. I'm not letting you out of the stipulation. Here's the judgment. So not only was there no explanation, frankly, we didn't even know what was coming. Now, the universe of this, I'm sorry, were you? If, in fact, we reverse it and send it back, can we order a new trial? I would hope that you would remand for a new damages trial so that we can put this verdict in the proper context for what really is at stake here. Limited damages based upon the revision of the stipulated? Based on the fact that, yes, the courts could have to prove damages based on the fact that there were, you know, we should be able to prove that there are non-infringing substitutes and that the two stents that they want lost profits on were infringing stents, just on those two issues. Just quickly. There is one more issue. I understand. I was going to move to that. But just quickly on the stipulation issue. I take it that the only pertinent record materials with respect to the original stipulation are the exchangers at 4821 of the Joint Appendix. That's the transcript. That's pretty sketchy. It's very chatty, I guess I'd say. It's very chatty. It goes on for several pages. It starts at, I would say, 4821. Well, I don't know. From 4821 to 4827. But the real issue regarding the stipulation is at page 2838. Actually, it starts earlier. 4819, I'm sorry. 4819, it goes to 4827. But the real, the last piece of it on 4827 from lines 9 to 14 is. But if you go to 4821, that's the page in the transcript of 2838. That's where the stipulation is at. Right. It's there. Right. It's there, and it's also at 4827, 9 to 14. Is there any. But it's in both places. Is there any point at which the limited nature of the stipulation is spelled out by counsel for BSE? You mean that it was limited to that trial only sort of language? I did not find that one. You agree that the not should be in there? Yes. Go ahead. One more quick question. I mean, I think it's your fallback position here. But as I read the brief, at least in the blue brief, what you conclude is the abusive discretion here was her unwillingness to try to reconcile the two decisions, the decision to deny a new damages trial with its previous ruling. Why isn't, therefore, the remedy for that to send it back and give her and insist that she reconcile them? And, frankly, to give us a chance to discuss it because we didn't even litigate the issue. It wasn't the situation where we had an argument before it discussed the record and she ruled, okay, I'm going to change my mind and deny it. What happened was, frankly, I think she was ready to get the case done, and she changed her mind on her own without explanation, without argument, without briefing, and so here we are. So I think it should be, at a bare minimum, as you said, remanded for briefing and discussion and litigation rather than summarily moving the case forward. On the interest issue, can I start the ball rolling with a question as to, well, I guess, let me give you something to shoot at. Well, this is, I'm limited pretty much to that. Why isn't this the right template for looking at the question? You've got a hypothetical but for a world in which royalties would have been paid from the beginning of the infringement period, and the patentee would have, A, received the royalties, B, gotten interest on the payment, and pay taxes both on the royalties and on the interest on the royalties as that interest accrued. Interest would have been compounded on a regular basis and the royalty payments would have accrued, and at the end of the infringement period, there would be a fund of money in the bank. Let's say it's $5 million. Now, that's $5 million that they don't now have, and the question is, what kind of judgment has to be entered in order to give them the benefit of that $5 million? Now, since they've already paid taxes on all that money, don't you have to give them, well, 1 over 1 minus .35, 1.54 times the $5 million in order to give them the equivalent, so they have $5 million after they pay the taxes on the judgment that they're awarded. Isn't that the right way to look at this? If you did it that way, the answer is yes. Now, in what respect does Cordes' analysis depart from that, in your view? You're right on it, and I can explain it this way. It sounds like you don't want me to talk about the law about it being compensatory versus not. No, no, I think we're down to the nitty-gritty and the numbers. So this came down to actually entirely the question you just asked, which is the methodology. There was no dispute on the taxes, no dispute on the rate, tax rate, no nothing. It's distinguished from all other cases. It came down to one question, which is, what is the method? What we proposed is similar to what Your Honor proposed. Not exactly, and I'll explain the difference. What they proposed was the opposite, which is, so we proposed in our expert declaration, assume Cordes gets paid the royalties on a regular basis throughout the time period, and then pays taxes on them, and then collects interest on the remainder after taxes. What they proposed is assume Boston Scientific doesn't make the payment, but had to make the payment, so Boston Scientific keeps the money, and then they keep it during the next period, and then they keep it during the next period, so the money's accumulating at Boston Scientific, and Boston Scientific is not paying tax on it, but Boston Scientific's collecting interest on it. Boston Scientific wouldn't pay tax on it because it's not income to them in the traditional sense. So they do an analysis that all of the money is retained at Boston Scientific, and all of the money collects interest at Boston Scientific, versus our proposal, which is assume the money's paid to Cordes, taxes are paid, and this collects interest. When you do that math, this comes out to be a smaller number than this. This is compensatory, this is disgorgement, and that's the thrust of the two differences that were presented to the district court. They want a disgorgement theory, which is Boston Scientific retain the money and have the opportunity to collect interest. So at the end of the time period, give all that benefit to Cordes, but they take no account of the taxes, versus our proposal, which is the money was sent to Cordes, they paid their taxes, and collected interest. And it's a much smaller number. So when you do their analysis, they present it to the district court. Well, all that money that Boston Scientific retained, they collect interest on it, so if we deduct 35%, then we add 35% back in, it's a wash. It doesn't even make any sense from the point of view of the math. From our point of view, as your Honor said, you measure the taxes as you go along, deduct, and collect interest on the remainder. So it's a simple question that's the only question that's going to... You have to gross up at the end, right? There's nothing wrong with grossing up at the end. Well, no, it's because they did math, and that's why this is the point that I was coming around to. There's two ways to do the math, which is on this side, on the compensatory side, hopefully that's where we're going here. If Cordes pays the tax on the money, and then you give them full interest all the way, but don't charge them a tax on the interest, then, you know, you gross up the interest. But they are going to pay, they would be paying interest in the but-for world, a tax in the but-for world on that interest, right? I mean, there's no reason, assuming some special tax provision, you and I are going to pay taxes on interest, presumably, so is the company. Yes. Staying close to the real world, this can get really complicated if you go into different methods of addressing this, but if my simple-minded way of approaching this is correct, then you absolutely have to gross up at the end, right? If you are paying the damages award at the end, and they're going to pay taxes on it and get less than the compensatory model, you should fix that. So you and I are not in disagreement about that. Okay. But you can account for that in the math. All I'm saying is, depending on what methodology you use to get to the final number, you may or may not need to gross up. I can assume there may be other algorithms. But I'm agreeing with you. If they're paying taxes at the time the verdict is paid, and the tax is going to result in less than a full compensation, then it should be fixed. That shouldn't be – this isn't an attempt to get around that. You don't need to decide that issue today. We all agree on that. The only issue you have to decide today is – the issue is, is it a compensatory model where Cordes should be made whole, and that's our position, or is it a disgorgement model, which is you model what Boston Scientific would have made by not paying and then disgorge all that and give it to Cordes. That's their model, and that's punitive. It's against the Supreme Court law and it's against all of this court's cases. It's supposed to be compensatory, not punitive. It's a compensation model, not a disgorgement model. If Boston Scientific was paying all along as part of a license or a payment in royalty, that would be deductible to them, wouldn't it not? So would you take that into account as part of the payment? In their proposal, they took nothing. They let the money accumulate at Boston Scientific and collect interest with no tax consequences whatsoever. But there is a benefit to Boston Scientific if they had paid the royalty from the beginning. Yes, yes, yes. Because you would be able to deduct it. Yes, and there's no doubt that Boston Scientific – and this is the point I was trying to make – there's no doubt that Boston Scientific was benefited by not paying the royalty, and there's no doubt that if they paid it, there was better tax time. So Boston Scientific has some benefits along the way under either approach. My only point is that's not relevant to the point of prejudgment interest. We're supposed to be looking at courtesy and making them whole, not Boston Scientific and disgorging what Boston Scientific benefits. Let me ask you this. I don't think you ever give us an actual number that you think was the right number for the interest, but you say that the number that the judge came up with gave them about a $100 million win. Here's what happened, and I can tell you why. Let me tell you where I'm going with this so you can answer both parts of the question. Yes. The reason this is puzzling to me is because the number that shows up on A17641, the yellow sheet that has the worksheet, is $439 million for the total, and that's, of course, more than $100 million difference from this other number. If you can square that up for me, I'd appreciate it. So interest only, what was presented below, courtesy won $296 million, rounding off to $296 million. We presented, not we, but Boston Scientific presented $86 million. That's not the figures on appeal for this reason. Boston Scientific got a little more aggressive in the calculation presented below because they gave, in their calculations, prime rate up until the judgment, treasury bill rate after the judgment. So that $86 million is smaller than it would be after this appeal because we've conceded on appeal that it should be prime rate the whole time period until it's paid. So the number isn't $86 million, and we didn't in the briefs calculate what it would be over the whole prime rate period. And that's what accounts for the low rate, $439. Yes, so it would be more than $86 million. Okay. The problem I have with that aspect of it is it seems to me that's what led the district court to do what she ultimately did. She asked the party if she was inclined to do it your way, but then when she asked for the calculations, she noted that they were, you called them aggressive, one could call them greedy, I mean, you could use whatever term you want. We just don't advise. Don't advise. Okay, I'll buy that. And then she kind of threw up her hands. She says, I don't want to spend two weeks and have my court spend two weeks trying to do the right calculations. Please let me address that. Yeah, okay. I think it's a fair point, but it's not fair in this regard. They shouldn't have asked for treasury after the judgment. Agreed it should have been prime the whole way. That's the only thing that Boston Scientific did in their calculations that was ill-advised. But we complied with the court's order. The court said, give us a compensatory model taking account of taxes, and we presented that. Our logic and our analysis were otherwise not problematic. Cordes is the one who disregarded the court's order. They did not take a compensatory approach. They didn't account for taxes whatsoever in their proposal. They submitted a proposal to the court that was Boston Scientific retaining all the money and collecting all the interest with no tax consequences, then they deduct 35 percent, add 35 percent, and say it's all a wash. They're the ones who confused the district court. So she gets these two proposals and sees the math entirely different. If they had done what they were supposed to according to the court's order, the math would have looked the same. The only difference being we took a treasury after judgment, and they had prime the whole way through, and maybe the district court wouldn't have gotten frustrated and thrown up our hands. But getting frustrated with the math is not a reason to make us pay a $296 million punitive prejudgment interest on this historic verdict. We should figure something out. Well, we're talking about $100 million. It's over $100 million. Well, $101 million or something. You get to about $101 million. But still, that's hugely punitive, and the case law is pretty clear that we should have just gotten, again, we didn't even have a hearing on it. The two submissions came in. And, frankly, what happened here, with both of this and with the damages awarded and with the judge's reversal on the stipulation, the case has been pending a long time. It's been in the court of appeals twice, and the judge is frustrated, and she wanted the case done. And, frankly, that's what happened. She had told us we were going to get damages trials. She changed her mind. She reversed the stipulation. She told us she was going to take into account the taxes. She sees two proposals. And frankly, she said, I'm done with this. She bottled the blue, issues a judgment, and here we are. That's not the way a case of this size or this magnitude should be dealt with. We should get to the bottom of the matter. Okay. I think we've definitely made you work overtime. In fact, probably violated the Fair Labor Standards Act. I do appreciate it, though, Your Honor. That's fine. We appreciate the counsel, and I expect we'll get counsel from Mr. Diskant now for Mr. Schwartz. Why don't you give Mr. Diskant an extra 30 minutes if he needs it. I hope I don't, but we'll see what happens. I appreciate the time. I represent Cordes, and as this court is well aware, this case has been running on for over a decade. Medtronic eventually paid the judgment in full. It's not appealed, and Boston is here challenging three discretionary rulings by district court. That's all that's left to be decided. I would believe all three of them were correct and certainly not in the use of discretion. Let me start with whether there should be a true trial on liability, and there was a lot of discussion about the legal issues, which I think are very interesting, but if you'll indulge me, I'd like to address the facts first because I think it frames the legal issues. The facts, the question, this court basically changed the claim construction from effectively smooth through touch to smooth enough to be delivered interluminally and sent it back to district court based on her extensive familiarity with this long record to see whether it made a difference, whether there should be a new trial on validity, while the district court, in fact, has a substantial amount of experience with dispersive reference. Every time a case has come up to this court, there's been an ERSIC issue. ERSIC is, as the district court said, the antithesis of the invention, but it's the closest part because this is a novel, path-breaking invention. There isn't really any good prior art. So ERSIC is what has been focused on throughout all of these years. In 2004, before the retrial, the district court addressed ERSIC in a legal opinion on the doctrine of equivalence, and in that opinion, she found correctly that ERSIC is the antithesis of the balloon expandable stent. She found that there is balloon expandable stent and ERSIC are disparate devices that have no logical relationship to each other. Why is that? Because ERSIC is essentially a surgical stapling. It is used in open surgery, traditional surgery, where the chest cavity is cut open. A surgeon goes in with the ERSIC pistol, which has a staple-like device at the end of it. He places it at the appropriate position in the aorta, pulls the trigger, the staple is put in place, and he withdraws the pistol. That is ERSIC. And because ERSIC has a physical resemblance to the balloon expandable stent of Dr. Palmaz, it has been the subject of all this discussion over the years, but it is, as the judge said, the antithesis. It has no relationship to an intraluminal device, which, as Dr. Palmaz's patent explains, is something that is delivered remotely from outside the body to a remote location inside the body and thereafter expanded. Although the patent office did reject the claim on ERSIC initially. Well, the patent office prosecuted the claim, as it always does, diligently and carefully. And in the end, I actually should take issue at this point about Claim 13. Claim 13 was canceled by us in re-exam because we were in litigation, we wanted to go back to the trial court, and so we canceled it and made it perfectly clear in the record that we weren't conceding anything. And in fact, at trial, no one contended that the only point of novelty was smooth. The judge correctly instructed the jury that you should consider the claim as a whole, without objection, from Boston. That's the right test. So Claim 13 and the patent prosecution, in the end, was irrelevant except for this. I think if you look at the examiner's final statement, it's an extremely noteworthy statement because he finally says in approving the claim, Claim 23, none of the references, and he underlines none, I've never seen this in an examiner's statement, none of the references of record, whether considered singly or combination, renders this patent invalid. It was a very strong affirmation. But be that as it may, we all know that in the end, it comes down to what happens in the court and before the jury. So first, Judge Robinson, to whom this court sent this back for her considered view, found HRSAC to be the antithesis of the balloon expandable stem. Let me ask a question, which I probably should know by now, but I don't. HRSAC, when it is used, is it used, given its tubular structure, is it used inside arteries, veins, aortas, to adhere to the inner surface of those structures, or is it used for a different purpose? The answer is yes and no. Okay. This is the similarity that they attempted to develop. HRSAC is used to staple a graft to the inside of an artery. Right. So the artery is cut open. Right. And there's an open part, and the staple is inserted through the graft so that it is, say, it's an inch long, half an inch is in the artery and half an inch is in the graft. Right. And then it's expanded. That's what it does. That's all it does. And the points, whatever you want to call them, secure the graft to the wall of the artery. Yes. That's exactly how it works. All right. And since I've interrupted you... It is not delivered remotely from outside the body. It's delivered... When you had the staple gun reference, I got worried that I didn't understand. I think that's essentially what I understood. That's exactly what it is. There is literally a gun in the package that is used to deliver it. All right. Now, while I've got you interrupted, can you talk about the language in HRSAC about cuffing and I forget the other smoothing... I agree with the smoothing. It talks about rolling over the end. Right. It has nothing to do with the... What's the other word besides cuffing? There's another word that's in the same segment. I frankly don't recall. But it's talking about what happens at the very edge of the bursa. It's not talking about the device as a whole. The device doesn't work without the edges protruding out and going into the wall. So, there we have trial. In 2005, the judge to whom this court sent this back had a trial. And at that trial, the exact issue that they want to retry was tried. The exact issue. The reason that Mr. Damaris has all this evidence to point to in the record is because in 2005, they tried to prove to the jury that HRSA could be delivered interlibinally or that there's a reason to modify it to deliver it interluminally. And the reason they did that is because the claim, quite apart from the change in the definition of smooth, required an interluminal graft in which it had a first diameter that permitted interluminal delivery. And so, they tried exactly the case. They now want to try all over again. They presented witnesses to argue that HRSA could be delivered interluminally or could be modified. And that's the real point, as your Honor observed. They presented evidence that you could make it smaller. You could get rid of the pistol and use a balloon and round it and smooth it and do all these things to it. And the problem with that, as Judge Robinson noted in his claim, is there was no reason to do that. You can take a pipe, you can take a chain-link fence, and you can modify it to turn it into a stent. But there was never any reason why someone interested in interluminal delivery of curing heart disease by not surgically exposing the body would ever look to HRSA, an open surgery device. But the HRSA device, if it was crimped and cuffed, could be delivered interluminally. No. By the teachings of the Paulin's abstract, couldn't it not? It would have to be cuffed, and it only occurs at the very end. Right. And the crimping is what smoothed it out. You would have to, if you took the ERSIC device, but if you also took my ring, if you took anything, any round thing, if you made it small and you made it smooth and you placed it on a balloon catheter, you could deliver. I mean, that's a truism that doesn't really advance the debate. And so we had a trial, and we had a trial in which they attempted to prove that ERSIC was a motivation to do what Your Honor just suggested. And they completely failed, and the jury resoundingly found in our favor on the question of validity, and Judge Robinson heard all of this. And so when the panel sent back this question to Judge Robinson, she indeed did have an intimate familiarity with ERSIC, and she had a very keen understanding of what would have happened at this trial if the jury had to find whether there was a motivation to modify ERSIC to deliver it interluminally, and she knew exactly what the answer was. It would make no difference at all because the jury had already considered that case and had found against Boston. And she writes in language that is very, very strong, at 14, with respect to ERSIC, there is no credible evidence of record that supports Boston's contention that ERSIC disclosed a bracket smooth enough to deliver or that there was a motivation to do it. The record is replete with evidence that ERSIC disclosed a fixation sleeve which by its name, its purpose, its design, and its operation was not meant to be or could it be delivered interluminally, and then to argue otherwise defies common sense. Now, she is saying, I believe, that no reasonable juror would find this credible, that it's not a good argument, it's a loser, and the change in claim construction makes no difference whatsoever. So I think that's what happened. I think she has found in the strongest possible terms that this change in claim construction would not conceivably have altered the outcome. Now, Blake, I was going to get to you. I think you were just about to get to the question of the standard. Yes, the question of the standard. Okay, so what is the question? I think there's, I think the right answer is that this is a question that should be decided under Third Circuit law, but I think in the end it doesn't make any difference what standard is used. So let me start with what the, this court obviously decides the propriety of a jury instruction insofar as whether it does or doesn't accurately state the proposition of fat law, which would include the claim limitations when they are included in the jury instruction. That's a Federal Circuit question. This court has, every time that it has expressly addressed the subject of what the district court should do if there is an error in the instruction on a question of patent law, it said that regional law applies. We cite the cases in our brief, but it's done it with questions of inventorship, prior art, corroboration, all clear Federal Circuit issues on what the standards are. But as to an error in the instructions and whether it's harmless or not, this court has repeatedly said that that is a question for the regional circuit law to go. So what's the law on claim construction and changes in claim construction? There's only one case that Boston cites on the subject in which it supports the argument that the Federal Circuit law governs the harmless error analysis, and that is the Arlington case. I frankly think you should take a look at Arlington. I think they're misreading it. Arlington says that Federal Circuit law applies to review of jury instructions involving issues of patent claim construction, and then it proceeds to review the claim construction and uphold it. I don't think Arlington is saying anything other than the substance of claim construction is a Federal Circuit question, and it certainly doesn't address harmless error. It upholds the claim construction. It never gets to, well, it happened if it were wrong. So I think that is the only case that supports the idea that Federal Circuit law governs. Now, if Federal Circuit law governs, and there are certainly a number of Federal Circuit cases that talk about harmless error without identifying whose standards are being defined, I don't think there's a substantive difference. The Federal Circuit law is highly probable that a correctly instructed jury would have come to the same verdict looking at cases like Weimar in this court where evidence in support of the verdict is so overwhelming that the same verdict would necessarily have been reached absent the error. Necessarily is a pretty strong language, but I think you would... I'm not trying to... You're not suggesting that you're limited to that. You would want a broader standard than that, I assume. I think we've been under any standard. Well, I know, but you prefer to have a little margin of error, right? I would say the Federal Circuit standard is, you know, a tad more forgiving than... I don't think Katiakis is a tad more forgiving. I like Katiakis a lot. I think Rule 61 is pretty good. Let me ask you this, though. I think we're probably going to the same spot. Ecolab? Yes. Okay. Ecolab, I think, is a correct analysis on the facts before it. And I don't think it creates a new standard. And the reason I think that is, in Ecolab, there was a claim term of a housing containing a surface. And the case was tried on one particular surface being the only one that was considered within the scope of the claim, which was the inside wall of the housing company. And on appeal, the court found that there were six other surfaces that could have been looked at. And those issues hadn't been tried. They were just there. And so here the appellate is saying, well, there's six other issues we wanted to try, and we never got to try them because the claim construction didn't make them relevant. And I think where you have a circumstance like that where the issues just weren't tried, the claim construction changes things so as to introduce disputes that hadn't been litigated, I don't think it was unfair to conclude that where there was substantial evidence supporting those theories and they hadn't been litigated, that it couldn't safely conclude that the evidence was so overwhelming that no error occurred. I think a case like this is very, very different where exactly this issue was already tried. And so the court saw it, knew it, understood it, and I think can safely find that the evidence was so overwhelming that the same verdict would necessarily have occurred. I'm quite happy Judge Bryson that it wouldn't necessarily have occurred, and the reason I am is because that's the case that was tried, and we tried that case. Judge Bryson saw us try that case. She saw this evidence presented about modifying ERSIC, and it was rejected because it had no connection with ERSIC, with the balloon expandable stand. So this was truly a case of a half-breaking invention, unlike the prior art. I must say that just standing in front of the jury, talking about looking to open surgery for the solution when that was the problem, I mean the problem that Dr. Tomas was addressing was how can we treat heart disease without cutting open the body cavity, without exposing the chest, without getting into the heart? And that was not the place that scientists were looking for solutions. That was the problem. And this is very, very compelling evidence. ERSIC is, as Judge Robinson said, the emphasis of balloon expandable stand, and a jury would be utterly uninterested in hearing exactly the same evidence that it rejected once already on whether there would be a reason to modify ERSIC. That's the same evidence that was presented and rejected. So I think the court was right to send this back to Judge Robinson for her views on it. I think she's told you her views in the strongest possible language. I think she believes that no jury exercising common sense would accept this evidence. Could you cover the issue of, are we finished? Because I still have some problems about the stipulation. Oh, yeah. If you would cover the stipulation. I would be happy to move to that. Because we've run out of time. I would be happy to move to that. The stipulation I think is a pretty straightforward abuse of discretion issue. I think Judge Cross's analysis was exactly right. Back in the year 2000, PSC did not want, for its own reasons, to have the jury here that ABE had been found to infringe. Well, they had a pretty good reason for placing the stipulation for it on a prejudicial basis. They had their own strategic reasons for thinking that was important to them, and they entered into the stipulation freely and fairly and on an open record, and they took advantage of the stipulation. We were seeking $470 million in damages. The jury instead returned $325 million. We had a case in which the Medtronic issues were basically taken out of play. So they had a stipulation. They benefited from the stipulation at trial. Then, a few years later, the judge decided that the premise on which they entered into the stipulation had been removed. She ordered a new trial. She ruled on JAMAL that ABE didn't infringe. And when the premise of the stipulation had been removed, she, I think not unreasonably, concluded that they weren't bound by the stipulation. And so she said that they were unconditionally bound by the stipulation. This was an instance in which, because of her legal ruling, the premise had been changed and it was permissible to relieve them of it. However, the ABE verdict was then reinstated, and there is no reason to allow them to be relieved from the stipulation. They could have litigated exactly this issue in 2000. She never gave any reasons for it. She only essentially stated her reasons. First off, I think two things. First, Mr. Damaris is incorrect in saying that this was some kind of surprise. This was litigated. We had motion practice on whether there was or wasn't going to be a third trial, a second trial on damages. We stated our position, they stated their position, and she ruled. With respect to the details of the original stipulation, the judges, 2002, is that right? She litigated, and that's why she rules on it, on page 11 of page A19. She says the court declines to allow BSC out of its agreement based on later business-related proceedings of which it was not a part. What page is A19? Page A19. And the earlier order that she had entered was called to her attention. Absolutely. She was arguing about it, and I don't think there's any inconsistency. I think it's perfectly apparent. In the first case, she said the premise has been removed, and she meant to say it. It was obviously true. That's what we were arguing about. That's what the first order was about. They were arguing the premise of our stipulation has been removed, therefore we should be relieved from it, and she agreed. Doesn't the issue here in the question of whether they should continue to be bound by the stipulation depend, at least in part, on the scope of the original stipulation? That is to say, if it's very clear that they had stipulated on a for-this-rise-only basis, wouldn't it be inappropriate for her to expand, in effect, the scope of what they had stipulated to? That's the question. I mean, we've all treated this as-she treated it, at least to some extent. I know you disagree with this interpretation of the word conditional, but she did say this was a conditional stipulation. But what I'm looking for-let me just lay out what I'm trying to find. Is there anything in the original trial record where this was discussed over a period of, I don't know, a few minutes? It's not the record. In terms of off-the-record stuff, there's nothing different, really. Basically, we had a trial. There was an issue. They stipulated. They did not put any limitations on their stipulation. Okay, so the argument would have to be, well, it's necessary under the trial because it came up in the trial or whatnot. There's no language, yes. Absolutely not. No, there's nothing that confines it. They made a stipulation on the record. I thought her ruling in 2003 was perfectly fair and appropriate under the circumstances since the premise of the stipulation had been removed. I likewise think this ruling is perfectly fair because the premise hasn't been removed. There's no basis to relieve them from it. And, you know, Mr. Tamaris talks about what would happen in a retrial. I don't know what would happen in a retrial. We came up $150 million short. And, you know, it would just be a completely new, wild card. I don't see any purpose for this. We're now 12 years down the road. The question, though, is there are non-infringing alternatives on the market that's going to affect the damages and they're going to go down. Well, I'll tell you that, first off, the non-infringing products were on for a very short time. The infringing products that we were talking about were mostly the first-generation AVE stents. This case was tried in 2000, and the AVE stents were the only product. The second-generation AVE stents came on the market, I think, in the summer of 2000. They were half a year of sales or something. That's the ADES? Yes. The second series, the S series. The S series. So what we're looking at, you know, that would—I agree with you that that pushes the number down. But what I'm saying is that a whole new trial, you know, we had all the arguments that were rejected, and we'll push it up. So I don't know what the outcome would be. What I'm saying is that we had a fair trial in which they got the benefit of the stipulation. This may be a big number, but it's a smaller number by about 33 percent than the number we were seeking. And they got the benefits of the stipulation at the previous trial, and there's just no reason to let them out. So I would say that the correct ruling is certainly not an abuse of discretion. And I do think she explained it adequately. If you read that and read the prior briefing, I just don't see that there's a— Well, she just put one sentence in there. I don't think it needs a long explanation. It would have been useful for some account earlier. I think if you go to the briefing that supports—that underlies this, I don't know. I think it should be in the record, if not in the appendix. Do you agree that the Third Circuit standard should be applied? Yes. Now, how do you square the determination that she made with Waldorf v. Schueter? Your Honor, I'm afraid I'm not familiar enough with it to— Well, those cited by the appellants in their briefs, and it deals with the stipulation standards, and it gives the review standard that the court has to follow. Your Honor, I'm not familiar with it. You're not familiar with it? I have not read it. Let me just add one issue here, which is Mr. DeMaris raised. The second reason for damages trial, which was this— which shows up in their defibrillatory for the first time, based on a ruling on the Jang patent, which this court entered a few weeks ago. Essentially, they want to argue—it's on page 21 of the great brief. They would like to argue that the Cordes damage claim should be also reduced because of an infringement verdict against Cordes in another case. They would argue that we aren't entitled to loss of profits. That's an issue that wasn't raised on this appeal. It wasn't raised in the district court. It's waived. It's also an issue that no court has ever endorsed. That is the proposition that infringement of another patent bears on— the plaintiff's infringement of another patent bears on the damages it can recover, and in this case, it just doesn't belong here. If I could address briefly the last issue. Yes, please. Let me ask you again at the outset to frame the question again, at least for me. Do you disagree with my construct? I was going to start, too. Your construct is exactly right. It's exactly what we did, and we're happy. The problem is, basically, you use after-tax or before-tax dollars, and virtually every court in this country has used after-tax dollars. The district court did so here, so my going-in proposition is it can't possibly be an abuse of discretion to use after-tax dollars when virtually every court in the country has and none has ever been reversed for doing it. Go ahead, please. But you came up with the pre-tax—she asked for a pre-tax calculation, right, and you gave her an after-tax. No, we didn't. We did exactly what Judge Bryson did. Let me ask you about that. Let me explain. Okay, go ahead. It comes up to the same number, because Judge Bryson's hypothetical was that the money's paid, and as it's paid, you pay taxes.